## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

**DAVID F. FREEMAN,**

       **Plaintiff,**

**v.**

**MEMORANDUM AND ORDER**
**Civil File No. 04-3538 (MJD/SRN)**

**ACE TELEPHONE ASSOCIATION,**
**d/b/a ACE COMMUNICATIONS**
**GROUP,**

       **Defendant.**

---

Jeremy L. Johnson, Marshall H. Tanick, Teresa J. Ayling, and V. John Ella, Mansfield Tanick & Cohen, P.A., Counsel for Plaintiff.

Keesha M. Gaskins, Shane V. Bohnen, and Shirley Okrent Lerner, Bowman & Brooke, Counsel for Defendant.

---

I.  **INTRODUCTION**

This case arises out of a dispute regarding Plaintiff's termination of employment. The case is currently before the Court on Defendant's Motion for Summary Judgment. [Doc. No. 42.] Defendant seeks dismissal of Counts I, II, and III of the Complaint along with its costs and fees associated with the motion. Dismissal of these counts will result in dismissal of the case. Oral argument was heard on November 29, 2005. For the following reasons, Defendant's motion is granted in part and denied in part.

1

## II.    FACTUAL BACKGROUND

Plaintiff Freeman was first hired by Ace in 1977 as a controller. Freeman had a very successful career at Ace, was promoted to Chief Financial Officer, and eventually became Chief Operating Officer ("COO"). In 2003, the COO title was changed to co-CEO. Freeman became COO in 1997 when General Manager Jon Owens left the company. Owens' tenure had been marked by turmoil, including lawsuits stemming from alleged consensual affairs between two Ace managers, Owens and Allan Cordes, and subordinate employees. Freeman knew about these situations and was aware of their negative impact on Ace.

During the time that Freeman was Ace's COO and co-CEO, he had the responsibilities of a financial officer, signed Ace's tax returns, authorized expense reimbursements and payments, and made sure that all payments on behalf of Ace were legitimate. Ace's other co-CEO, Dave Schroeder, was primarily responsible for the operation of Ace's Michigan office. Melanie Hansen was Human Resources Manager for all Ace employees in both Minnesota and Michigan. Prior to 2003, Ace's Board of Directors was satisfied with Freeman's work, but had concerns about Freeman's failure to interact with employees. Ace's Board hired an outside consultant to help Freeman resolve these issues.

In January 2003, Freeman questioned Ace's policies for reimbursing Board members for travel expenses.[1] At that time, the issue was reimbursement for mileage incurred as a passenger, rather than the driver, of a car and per diem payments for out of town trips to Michigan. Freeman also took issue with Ace's use of preprinted mileage reimbursement forms. The forms contained a preprinted number of miles that represented the round trip from each individual Board member's home in Iowa to Ace's headquarters in Houston, MN. The Iowa Board members all submitted these forms for reimbursement, even when they car-pooled from Iowa for Board meetings. Thus, some Board members were getting reimbursed for mileage that they did not actually drive. The Parties refer to this as "phantom mileage."

Although this had been Ace's practice for years, Freeman testified that he only became aware of the phantom mileage issue after his secretary, Jean Krambeer, called it to his attention early in 2003. Freeman also stated in his deposition that he raised the phantom mileage and other reimbursement and per

---

[1] The record is a bit unclear as to whether this chain of events began in January 2002 or 2003. 2003 seems the most likely date since Freeman stated that he was not aware of the issue until his assistant returned from a CPA conference late in 2002. However, the Parties sometimes use 2002 as the date of the first report of mileage irregularity. The Court finds that this is an immaterial discrepancy. To avoid confusion, the Court will use January 2003 as the date these events began. This is the date closest to the date of Freeman's termination, and thus is the date most favorable to Freeman, especially for his whistleblower claim.

diem issues in 2002, but did not discuss the specific issue of the preprinted mileage forms used by Iowa Board members until September 30, 2003.

In July 2003, Freeman notified the Executive Committee that Ace may have been overcharging its employees for their health insurance premiums. Freeman felt that Ace had a fiduciary duty to return any overpayments, which could have amounted to as much as $750,000, to Ace's employees. The problem was placed on the agenda for the July 2003 Board Meeting.

In late July 2003, Hansen heard rumors from Ace employees that Freeman was having an affair with a subordinate employee named Kelly Thomas. Thomas was a customer service representative at Ace, and Freeman was neither her supervisor nor had any control over Thomas's work or pay. Both Freeman and Thomas were experiencing troubles in their marriages at this time, and Freeman sought out Thomas's company for support and "co-sympathy." (Pl. Mem. Opp. Mot. Summ. J. at 10-11.)

According to Hansen, Freeman's work habits changed during this time. For instance, Freeman began attending company events, where he sat next to Thomas and flirted with her. (Hansen Aff. ¶ 9.) This behavior was unusual for Freeman because he was known to avoid interaction with fellow employees, and because Freeman had no business reason to interact with customer service representatives.

Ace did not have a written policy against fraternization or any rules prohibiting relationships between co-workers.

On August 5, 2003, Hansen spoke to Freeman about the rumors. Hansen explained that she was concerned about Ace's reputation and perceptions of favoritism among the employees. Freeman replied that there was no need to be concerned since Thomas had been a classmate of Freeman's daughter, and was a family friend. Freeman assured Hanson that the relationship was platonic. Hansen found this response unsatisfactory, given Freeman's failure to show Thomas any familiarity during her prior three years with Ace.

In reality, at that time, Freeman and Thomas were more than friends, at least in Freeman's mind.[2] Freeman testified that the two had sexual relations at the end of July or beginning of August, although Thomas denies this. In addition, Freeman's July 2003 company cell phone invoice showed that Freeman made over 400 calls to Thomas's home, company cell phone, and office phone; and that on one day Freeman called Thomas forty-nine times in twenty-eight minutes. Many of these calls did not get through to Thomas. Freeman's co-CEO, Dave Schroeder talked to Freeman about this conduct, and Freeman insisted that he and Thomas were just family friends. On August 21, Hansen and Schroeder brought their

---

[2] Thomas testified in her deposition that there was no relationship and that Freeman's advances were unwelcome. (Pl. Ex. 29 at 14, 18-20.)

concerns to the Ace Board of Directors, and the Board decided to have Board President Evroul Beckman interview Freeman.

During the August 26 interview with Beckman, Hansen, Schroeder, and the Board Chair, Freeman admitted making the calls because he was under stress due to his divorce proceedings. Freeman explained that talking with Thomas helped him relieve the stress. Freeman denied that he and Thomas were anything other than friends, and members of the Board believed that the relationship was strictly platonic. Thomas never mentioned her relationship with Freeman to anyone at Ace.  Beckman told Freeman to keep this conversation confidential. Nonetheless, Freeman discussed the conversation with Doug McAnich, the consultant Ace hired to help him work on his employee relationships.

Beckman reported the content of the interview to the Board of Directors Executive Session the next day. Beckman told the Board that he accepted Freeman's explanation of his relationship with Thomas, but was still concerned that Freeman's behavior was inappropriate for a CEO. Beckman felt that Freeman understood his concerns, and stated that Freeman agreed to stop making the calls.

The Board was not satisfied with Freeman's explanation, and directed Beckman to inform Freeman that the Board would conduct an investigation of the situation through Ace's outside legal counsel.

6

After being informed about the investigation, Freeman confessed to Hansen that he was pursuing Thomas in the hope of having a sexual relationship with her, and that he understood his conduct was wrong. Freeman promised to end the relationship, and Hansen told Freeman to let her know how Thomas took the news. Hansen also suggested that Freeman write a letter of apology to the Board.

Shortly after the August 26 meeting, Freeman bought a second private cell phone which shared a "pal plan" with a private cell phone Freeman had previously purchased. Freeman purchased the second cell phone for Thomas so they could continue conversing without using Ace's land lines.

On August 29, Freeman wrote the apology letter in which he admitted that even though his relationship with Thomas was not sexual, it was "too close of a relationship for a subordinate." (Def. Ex. J.) Freeman also stated that the Board's concern was "valid;" that he "fully [understood] the potential issues;" and that he failed to maintain the dignity of the office he held at Ace. (Id.) Freeman promised to sever his relationship with Thomas and "return to a normal business relationship." (Id.) After receiving this letter, the Board discontinued its investigation. On September 4, Hansen asked Freeman how Thomas had taken the break-up, and Freeman replied, "Fine."  (Hansen Aff. ¶ 21.)

In September, Freeman's secretary, Jean Krambeer, approached Hansen and asked if Freeman was having an affair. Krambeer was curious because

7

Freeman had purchased Viagra using his Ace credit card.[3] The Viagra was shipped to the Ace offices in late July, and Krambeer opened the package as part of her normal work duties. Krambeer also told Hansen about Freeman's large cell phone bills for July and August, and the hundreds of calls made to Thomas. In addition, Krambeer said that Freeman had purchased a private cell phone in early August.

Hansen told Beckman about these developments, and they agreed that Beckman should send Freeman a letter seeking reassurance that Freeman had really ended his relationship with Thomas. On September 12, the Board delivered a letter to Freeman ("the September 10 letter") stating, <u>inter alia</u>, that although Freeman was a valued employee, it would not tolerate the burdens inherent when a superior has a relationship with a subordinate, and ordering Freeman to ensure that his relationship with Hansen was over. (Def. Ex. K at 1.) The Board also stated that it "[understood] that Ms. Thomas has taken the change in [the] relationship well," but offered Freeman support should Thomas become resentful. (<u>Id.</u>) The Board explained that this relationship and the gossip and speculation associated with it had damaged Freeman's reputation and management authority. (<u>Id.</u> at 1-2.) The letter also said that the Board considered Freeman a valuable employee and hoped they could "overcome" the difficult situation, and stated that

---

[3] Freeman admits using his Ace credit card, but testified at his deposition that this was just a mistake, and that he reimbursed Ace for this purchase.

it was willing to "look at whether we can go forward with [Freeman's] continuing leadership." (Id. at 1.)

On September 16, Ace received a phone bill that showed the purchase of the second private cell phone that shared a "pal plan" with the private cell phone Freeman had previously purchased. Hansen verified that Thomas was still using the first cell phone.

On September 19, Freeman signed his copy of the September 10 letter and returned it to Ace. Freeman ended his relationship with Thomas shortly after receiving the letter. No one from the Board ever talked to Thomas about her relationship with Freeman

The Board held a special meeting on September 25, and was informed about Freeman's Viagra purchase with Ace's credit card, and Freeman's purchase of private cell phones with a "pal plan." The Board authorized a formal investigation into Freeman's relationship with Thomas. Freeman was ordered to participate in the investigation.

At Ace's September 30 Board Meeting, Freeman reported on the following issues: (1) the phantom mileage issue; (2) certain Board members' failure to report taxable income to the IRS and Minnesota Department of Review; and (3) Ace's failure to reimburse employees for excess retention of health insurance

premiums. (Compl. ¶ 9.) At least the phantom mileage issue was put on the schedule for the October Board meeting.

Board members do not recall Freeman mentioning anything about mileage reimbursements violating IRS rules or about any car pooling irregularities, and Freeman now states that he removed all references to his discussion of alleged tax violations from the Board meeting minutes to save the Board members from embarrassment. At this time, the Iowa Board members did not think they were doing anything wrong regarding mileage expenses.

Freeman's expert witness, Howard Kaminsky, testified in his deposition that if Freeman knew that Board members were being overcompensated for mileage reimbursements, Freeman should have reported the payments as income on the Board members' 1099 forms. (Def. Ex. M at 89-90.) However, the Board members did not know whether Freeman made these corrections since their 1099 forms contained only a total income figure, and not separate mileage payments. Freeman never reviewed the Board Members' individual income tax returns to know whether Board members included reimbursed mileage in their taxable income.

On October 14, as part of the Board's formal investigation, Freeman gave a sworn statement in a proceeding similar to a deposition in which he confessed to having a relationship with Thomas; admitted lying to the Board about the nature

of their relationship and about his terminating the relationship; admitted that the relationship was inappropriate and that he tried to hide it from the beginning; admitted buying the first cell phone for Thomas so they could secretly conduct their relationship; admitted purchasing the second cell phone for himself for the sole purpose of continuing his relationship with Thomas; admitted buying the Viagra to have a sexual relationship with Thomas; admitted that he failed to follow Beckman's order to keep the matter confidential; and admitted that he acted unprofessionally and in an untrustworthy manner that was inappropriate for a manager. Freeman further admitted that he understood that the September 10 letter was a warning; understood that if he did not comply with the terms set forth in the letter, he could be terminated; and understood that he was still under the warning as of September 30, when the Board instructed him to meet with outside counsel as part of its investigation. Freeman also expressed regret about his behavior, and admitted that Hansen, Beckman, and Board member Dave Schroeder had all expressed concern about Freeman's relationship with Thomas.

In addition, Freeman admitted that even consensual relationships can open up the company to allegations of sexual harassment, and that Ace did not make it a practice to discriminate against married people. (Def. Ex. B at 99; Def. Ex. C at 88.)

On October 22, the Board reviewed the investigation and Freeman's statement, concluded that Freeman's deceptive behavior was unacceptable, and instructed Hansen and Schroeder to prepare an appropriate termination letter. Freeman was terminated on October 29, 2003, right before the start of the Board meeting at which the phantom mileage issue was to be discussed. The termination letter provided, in pertinent part, the following:

> While we appreciate your cooperation with our investigation, and your eventual admission of the mistakes you have made, we do not feel that you have shown the judgment and professionalism that we expect in a leader.

(Def. Ex. L at 1.) At the Board meeting that day, the Board adopted a new mileage reimbursement policy that only allowed reimbursement for miles incurred for driving a personal vehicle, thus solving the phantom mileage problem.

After his termination, Ace and Freeman attempted to negotiate a severance package, but they were unable to do so. Freeman was unable to find work in the area, and moved to Michigan to find a job. Freeman filed the instant lawsuit in July 2004 claiming wrongful termination based on violation of the Minnesota Whistleblower Statute, and gender, marriage, and age discrimination in violation of the Minnesota Human Rights Act ("MHRA"). On December 3, 2004, Freeman's

age discrimination claim was dismissed with prejudice by stipulation of the Parties.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Id. at 323. Summary judgment must be granted when the opposing party fails to make a showing that supports the existence of an element essential to the case and on which the opposing party bears the burden of proof at trial. Id. at 332-33. Summary judgment should seldom be used in employment discrimination cases. Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.   Freeman's Claims

Freeman asserts two claims under the MHRA: gender discrimination and marital status discrimination. Freeman also claims that he was terminated in violation of Minnesota's Whistleblower Statute. All the claims are analyzed under the traditional McDonnell Douglas burden shifting analysis. See Sigurdson v.

13

<u>Isanti Cty.</u>, 386 N.W.2d 715, 719-20 (Minn. 1986) (gender discrimination under

MHRA); <u>Cokley v. City of Otsego</u>, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001)

(whistleblower claim); <u>Gunnufson v. Onan Corp.</u>, 450 N.W.2d 179, 182-83

(Minn. Ct. App. 1990) (marital status discrimination under MHRA).

Under <u>McDonnell Douglas</u>, the plaintiff bears the initial burden of proving a

prima facie case of discrimination. 411 U.S. 792, 802 (1973). The defendant then

has the burden to articulate a legitimate, nondiscriminatory reason for the

adverse employment action. <u>Id.</u> Finally, to prevail, the plaintiff must show that the

defendant's proffered reason was a pretext for discrimination. <u>Id.</u> at 804.

### 1.   **Prima Facie Case Under MHRA**

Under the MHRA, it is illegal to discriminate against someone on the basis

of gender or marital status. Minn. Stat. § 363A.08 subd. 2. Freeman argues that

he was discriminated against on the basis of his gender because he was

terminated and Thomas was not terminated. Freeman also avers that he was

terminated because of his marital status. (Compl. ¶¶ 21-26.) Specifically, Freeman

claims that he was terminated because of his friendship with a woman to whom

he was not married. (<u>Id.</u> ¶ 22.)

To establish a prima facie case of disparate treatment, Plaintiff must show

(1) he is a member of a protected group, (2) he is qualified for his position at Ace,

(3) he suffered an adverse employment action, and (4) similarly situated non-

14

members of his protected group were treated differently.  See Sigurdson, 386 N.W.2d at 720.

### a.    Whether Freeman is a Member of a Protected Group

In unemployment gender discrimination cases, both men and women are members of protected groups. Ridler v. Olivia Pub. Sch. Syst. No. 653, 432 N.W.2d 777, 782 (Minn. Ct. App. 1988). For marital status discrimination claims, married, single, and divorced persons are all members of protected groups. Cybyske v. Ind. Sch. Dist. No. 196, 347 N.W.2d 256, 260 (Minn. 1984) (reasoning that applying a narrow construction to the statute would condone discrimination against certain classes of employees) (citation omitted). Thus, Freeman satisfies this prong of the prima facie test for both his MHRA claims.

### b.    Whether Freeman is Qualified for His Position

Neither Party argues that Freeman was not qualified to perform his job duties. Ace argues, however, that Freeman's conduct and lack of good judgment was not acceptable for a manager, and in that respect he was not qualified for his position. Since the Court must look at the facts in the light most favorable to Freeman, the Court concludes that Freeman has satisfied this prong of the prima facie test.

15

### c.     Whether Freeman Suffered an Adverse Employment Action

Freeman's termination was an adverse employment action under the MHRA. Therefore, this prong of the prima facie test is satisfied.

### d.     Whether Similarly Situated Employees Were Treated Differently

#### i.     Gender Discrimination

To prevail on his gender discrimination claim, Freeman must establish that Thomas is a similarly situated employee. To do this, Freeman must meet a "rigorous" standard, and must show that Thomas is "similarly situated in all relevant respects." Cronquist v. Minneapolis, 237 F.3d 920, 928 (8th Cir. 2001) (citations omitted). Specifically, Freeman must demonstrate that Thomas's acts were of comparable seriousness to his own. McDonnell Douglas, 411 U.S. at 804; Cronquist, 237 F.3d at 928.

Managers and staff workers are not similarly situated. See Michaelson v. Waitt Broadcasting, Inc., 187 F. Supp. 2d 1059, 1072 (N.D. Iowa 2002). Moreover, employees who work in different departments and hold different positions are not similarly situated. See LaCroix v. Sears, Roebuck, & Co., 240 F.3d 688, 694 (8th Cir. 2001) (analyzing plaintiff's Title VII claims under McDonnell Douglas).

16

Freeman argues that Thomas is the "similarly situated employee" with whom he should be compared because she was a woman engaged in the same consensual relationship as Freeman, she hid the relationship from her Ace superiors just like Freeman did, and she continues to work for Ace. According to Freeman, Ace completely disregarded Thomas's role in the relationship, and this fact gives rise to a prima facie case of sex discrimination.

The Court finds that Thomas is not similarly situated to Freeman. Indeed, under <u>Michelson</u> and <u>LaCroix</u>, Freeman cannot be similarly situated to Thomas because Freeman was a manager and Thomas was not, and because the two of them worked in different areas, Freeman having no supervisory responsibility over Thomas. The test for determining that someone is similarly situated is rigorous, and Freeman has not demonstrated that Thomas was similarly situated to him in all relevant respects. For example, there is no evidence that Thomas had a fiduciary duty to Ace, or that she deceived the Board. The fact that Thomas failed to tell anyone at Ace about her relationship with Freeman is not the same as deceiving the Board that the relationship was terminated when it was not. Thus, this prong of the test is not satisfied. Therefore, Freeman has failed to prove a prima facie case of gender discrimination.

## ii.   __Marital Status Discrimination__

To prove a claim of marital status discrimination, a plaintiff must demonstrate that the alleged discrimination was "directed at the marital status itself." <u>Gunnufson v. Onon Corp.</u>, 450 N.W.2d 179, 182 (Minn. Ct. App. 1990).

Since Freeman's marital status changed during the relevant time period, his divorce becoming final a month before his termination, Ace is unclear as to what status Freeman is arguing impacted Ace's decision. However, Ace notes that Freeman admitted that Ace did not have a practice of discriminating against married people.

Moreover, Ace argues that Freeman cannot claim that he was treated differently than Assistant General Manager Cordes, who was terminated, and General Manager Owens, who was allowed to resign, after alleged affairs with subordinates. Ace also asserts that in deciding how to handle Freeman's situation, the Board was simply putting into action the lessons it had learned from the Cordes and Owens situations: "sexual affairs between managers and subordinates, or even the perception of such affairs, can be harmful to the company." (Def. Mem. Supp. Mot. Summ. J. at 23.)

Freeman responds that although he is not similarly situated to former Ace managers Cordes and Owens because his relationship with Thomas was consensual, he is similarly situated to those men in one respect. All three men

were either married or divorced when sanctioned by Ace. According to Freeman, this demonstrates that Ace engages in a practice of terminating men who are rumored to engage in improper relationships while not terminating women for engaging in the same types of relationships. Thus, this prong of the test is not satisfied, and Freeman argues that he has stated a prima facie case of marital status discrimination

The Court can find nothing in the evidence that indicates that Ace considered Freeman's marital status when making its decision to terminate him. The termination letter states that Freeman was terminated for "business necessity" based on his lack of "the judgment and professionalism" Ace expects of its leaders. (Def. Ex. L at 1.) Not even the September 10 letter, a much more personal communication, ever mentioned Freeman's or Thomas's marital status. (Def. Ex. K.) Moreover, Board members testified that they did not even know if Freeman's and Thomas's relationship was sexual. Thus, Freeman's argument that Ace terminates men engaged in improper relationships is conclusory at best. Companies are entitled to hold executives to a higher standard than lower level employees. Michaelson, 187 F. Supp. 2d at 1072 (citations omitted). Ace based its decision on the fact that Freeman deceived the Board, not on Freeman's marital status. Thus, Freeman has also failed to prove a prima facie case of marital status discrimination.

### iii.    **Conclusion**

In conclusion, Freeman has failed to prove a prima facie case on either of his MHRA claims. Accordingly, this part of Ace's motion is granted.

## 2.    **Prima Facie Case Under the Minnesota Whistleblower Act**

The Minnesota Whistleblower Act ("the Act") prohibits retaliation against an employee who "in good faith reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or any governmental body or law enforcement official." Minn. Stat. § 181.932 subd. 1(a).

To establish a prima facie case, an employee must show "(1) statutorily protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." Cokley v. City of Otsego, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001) (citing Hubbard v. United Press Int'l, 330 N.W.2d 428, 444 (Minn. 1983)). The burden is always on the employee to prove by a preponderance of the evidence that the employer's action was for an impermissible reason. Id.

Freeman claims that he was terminated because he reported the following violations to the Board: (1) the phantom mileage issue; (2) certain Board members' failure to report taxable income to the IRS and Minnesota Department of Review; and (3) Ace's failure to reimburse employees for excess retention of

health insurance premiums. (Compl. ¶ 9.) The majority of the Parties' arguments focus on the phantom mileage issue. The reportable income issue is tied to this insofar as the taxable income at issue is phantom mileage reimbursement money. Very little briefing or argument was devoted to the insurance premium issue.

### a.    <u>Statutorily Protected Conduct</u>

Section 181.932 protects an employee who in good faith reports a violation of any federal or state law. <u>Anderson-Johanningmeier v. Mid-Minnesota Women's Ctr., Inc.</u>, 637 N.W.2d 270, 274 (Minn. 2002). Minnesota courts use the common sense definition of "report" to determine whether the communication at issue qualifies as a "report" under the Act. <u>Gee v. Minnesota State Colleges & Univ.</u>, 700 N.W.2d 548, 555 (Minn. Ct. App. 2005). Thus, report "means either (1) 'to make or present an often official, formal, or regular account of' or (2) '[t]o relate or tell about; present.'" <u>Id.</u> (citation omitted) (brackets in original). Whether a report was made in good faith is a question of fact, but courts may decide as a matter of law that certain conduct does not constitute a report. <u>Cokley</u>, 623 N.W.2d at 630. The Court must look not only at the content of the report, but must look at the employee's purpose in making the report. <u>Obst v. Microtron, Inc.</u>, 614 N.W.2d 196, 202 (Minn. 2000). The report must have been made for the purpose of exposing an illegality, and must implicate a violation of  a rule or law. <u>Gee</u>, 700 N.W.2d at 555-56. Nonspecific references to past practices not in conformance

21

with the law are not reports under the Act. <u>Cockley</u>, 623 N.W.2d at 631 (citation

omitted).

Likewise, mention of a violation of which the employer is already aware is

not a report. <u>Id.</u> at 632 (citing <u>Rothmeier v. Invest. Advisers, Inc.</u>, 556 N.W.2d

590, 593 (Minn. Ct. App. 1996)). A report that is presented as part of an

employee's job duties is not a report under the Act. <u>Erickson v. City of Orr</u>, No.

A05-481, 2005 WL 2277395, at *7 (Minn. Ct. App. Sept. 20, 2005) (unpublished)

(finding that genuine issues of material fact existed as to whether city employee's

report was an attempt to expose an illegality in the city's practices or whether

reporting such things was part of employee's job duties). For example, in <u>Andrews</u>

<u>v. Northwestern Travel Servs.</u>, No. C5-97-1766, 1998 Minn. App. LEXIS 299, at

*12 (Minn. Ct. App. March 10, 1998) (unpublished), the Minnesota Court of

Appeals found that when reporting billing inaccuracies, the plaintiff was just

performing her job duties, not "blowing the whistle." Conversly, in <u>Gee v.</u>

<u>Minnesota State Colleges & Univ.</u>, the court held that the plaintiff did not have a

whistleblower claim when her stated purpose in reporting was to fulfill her

responsibilities as a faculty advisor. 700 N.W.2d at 556.

The employee need not identify the specific law at issue as long as the

report implicates a violation of some law or rule adopted pursuant to law. <u>Id.</u>

However, it is not enough to simply determine whether an employee made

reports of suspected violations of law; the Court must also answer the critical question of whether those reports were made in good faith. Obst, 614 N.W.2d at 202. Whistleblower laws are not "intended to be used by employees to shield themselves from the consequences of their own misconduct or failures." Trimmer v. U.S. Dept. of Labor, 174 F.3d 1098, 1104 (10th Cir. 1999) (citations omitted). Rather, the Act contemplates the report of a neutral party who blows the whistle for the protection of the public or at least some other third person, in addition to himself. Obst, 614 N.W.2d at 200.

Freeman argues that although he first raised the reimbursement issue in January, he and Krambeer did not "forcefully" pursue it with the Board until September. (Pl. Mem. Opp. Mot. Summ. J. at 45.) Freeman further argues that his report was made in good faith, and that good faith involves an inquiry into his motive for reporting the reimbursement problems, something that is necessarily a fact inquiry, and thus not an issue that can be resolved on summary judgment. In addition, Freeman argues that the fact that he knew about the reimbursement problems for some time prior to the September 30 Board Meeting does not negate the possibility that he was still a whistleblower. Furthermore, according to Freeman, the fact that he knew about these problems prior to beginning his relationship with Thomas demonstrates that he did not report reimbursement discrepancies only after knowing his job was in jeopardy.

Freeman argues that this case is similar to <u>Groeneweg  v. Interstate Enter., Inc.</u>, No. A04-1290, 2005 WL 894768 (Minn. Ct. App. April 19, 2005) (unpublished). In <u>Groeneweg</u>, a hotel housekeeper reported to her general manager that certain front-desk employees were sleeping overnight in hotel rooms without registering as guests. <u>Id.</u> at *1. The plaintiff told the general manager that she believed such a practice violated a Minnesota statute prohibiting unregistered guests in hotel rooms. <u>Id.</u> Four months later, the plaintiff was fired for insubordination after missing a supervisor's meeting that the plaintiff had asked to reschedule. <u>Id.</u> The Minnesota Court of Appeals reversed the trial court's grant of summary judgment for the hotel, finding that the plaintiff's reports qualified as reports under the Act, and that fact issues remained as to whether the plaintiff actually said what she claimed she had said and as to whether her report was made in good faith. <u>Id.</u> at *3 (finding that those issues present fact questions that cannot be resolved on summary judgment).

Freeman also asserts that he was not responsible to fix the phantom mileage problem, thus reporting this behavior was not part of his job duties. Freeman notes that the policy of paying mileage reimbursement on the pre-printed forms was a policy adopted by Ace before Freeman worked for the company, not a policy adopted or designed by Freeman, and Freeman was therefore not responsible for Ace's mileage reimbursement policies. Thus,

according to Freeman, contrary to what Ace says, Freeman was not blowing the whistle on himself since he was not benefiting from the illegal reimbursement policy.

The Court finds that Freeman was not a whistleblower. Freeman was responsible for the financial health of the company and had a duty to report to the Board any irregularities in the Board's practices. Therefore, Freeman is like the plaintiffs in Gee and Andrews who were simply doing their jobs when they made their reports. Freeman had a fiduciary duty to Ace, and therefore common sense dictates that he was required to make these reports as part of his job. Moreover, Freeman's own expert testified that it would have been Ace's duty to fix Board members' inaccurate 1099 forms. Freeman even testified that he would have amended the 1099s if he had not been terminated. (Pl. Ex. 24 at 160-61.)

In addition, the Iowa Board members' mileage reimbursement was only one of several reimbursement irregularities Freeman brought to the Board's attention over a period of months, apparently beginning in January 2003. Freeman focuses on the September 30 presentation to the Board regarding the phantom mileage for the Iowa Board members, but in fact, phantom mileage had been an issue since January 2003, when Board members requested phantom mileage for a trip to Michigan. Thus, on September 30, Freeman was merely telling the Board

information it already knew. In addition, Board members do not remember Freeman mentioning that Ace's reimbursement policies could violate tax laws.

Although Freeman attaches importance to his July 2003 discussion regarding insurance premium overcharges, but there is not much evidence on this issue. More importantly, Freeman has proffered no evidence that withholding insurance premium overpayments is illegal. See Hedglin v. City of Willmar, 582 N.W.2d 897, 902 (Minn. 1998) (finding that, although "reprehensible," there is no law against firefighters being intoxicated at a fire scene, and therefore the report of this behavior did not implicate the Act).

Even though Freeman implicated violations of the law when he made his communications, this was part of his job. As the person responsible for approving reimbursements and for the overall financial health of the company, bringing these matters to the Board's attention was one of Freeman's job duties, if not one of his fiduciary duties to Ace. To that end, the Court agrees with Ace that to rule otherwise would be to open the door for all compliance discussions to be viewed as "reports" that implicate the Act. In addition, the Court finds that the instant case can be distinguished from Groeneweg because the court's decision in that case did not turn upon whether reporting was part of the plaintiff's job duties.

Therefore, Freeman has not demonstrated that he engaged in statutorily protected conduct, and this prong of the prima facie test is not satisfied.

### b.    Adverse Employment Action

Freeman's termination was an adverse employment action. Thus, this prong of the prima facie test is satisfied.

### c.    Causal Connection

The causal connection prong may be satisfied by "evidence of circumstances that justify an inference of retaliatory motive, such as a showing that the employer has actual or imputed knowledge of the protected activity and the adverse employment action follows closely in time." Dietrich v. Canadian Pacific Ltd., 536 N.W.2d 319, 327 (Minn. 1995) (citation omitted) (analyzing reprisal claim under the MHRA). However, although an inference of discrimination can be drawn when the conduct and termination are close in time, usually more than a temporal connection is necessary to create a genuine fact issue on retaliation. Peterson v. Scott Cty., 406 F.3d 515, 524 (8th Cir. 2005) (citation omitted) (examining retaliation claims under the ADEA and Title VII). A time gap between a report and a termination can undermine the claim of a connection between the two. See Kipp v. Missouri Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (holding that two month gap between discrimination complaint and termination "dilutes" an inference of causation in Title VII retaliation claim). Rather, to constitute a causal connection, a relationship between the two events

must exist such that one event is "generated" by the other. <u>Zhuang v. Datacard Corp.</u>, 414 F.3d 849, 856 (8th Cir. 2005) (analyzing a Title VII case).

Freeman argues that there was a causal connection between his report and his termination, and believes he was terminated because of his whistle blowing. According to Freeman, the short amount of time between his September 30 report and his termination at least raises a fact issue as to whether his termination was in retaliation for his whistleblowing. Freeman also argues that the fact that Ace adopted a new mileage reimbursement form after Freeman was terminated leads to the conclusion that Ace knew its reimbursement policy was illegal. Furthermore, since Freeman was fired after ending his relationship with Thomas, the relationship could not have been the reason for his termination, and thus his whistleblowing has to be the true reason, especially in light of the fact that the Iowa Board members could have incurred tax audits and potential tax liability for not paying taxes on phantom mileage. This, argues Freeman, gave the Iowa Board members motivation to fire Freeman.

The Court finds that there was no causal connection between Freeman's communications with the Board and his termination. At most, Freeman has demonstrated a temporal connection, but has failed to convince the Court of Ace's retaliatory motive since Freeman had discussed tax liabilities and reimbursement issues with the Board in the past, and never felt that his job was in jeopardy prior

to receiving the September 10 letter. (Pl. Ex. 24 at 72.) Moreover, a relationship between the two events does not exist that convinces the Court that one event is "generated" by the other. <u>Zhuang</u>, 414 F.3d at 856. The undisputed facts are that Freeman discussed reimbursement and tax liability issues with the Board at least as early as January 2003. The fact that the specific issue of pre-printed mileage forms may not have been discussed until September 30 is a distinction without a difference. The Board members were on notice that they were receiving improper reimbursement for phantom mileage long before September 30. Furthermore, even if the September 30 Board meeting was the first report, there is nothing more than a temporal connection between the two events.

Lastly, a common sense reading of the facts leads to the conclusion that the Board members did not want to do anything illegal. (Def. Ex. C at 220-27.) In fact, Freeman could not articulate any reason why the Board would want to fire him or cover up illegal tax returns. (<u>Id.</u>) This is especially true since the Board changed its policies and no longer engages in these illegal practices. Thus, there is not a causal connection between the communications and Freeman's firing.

### d.   <u>Conclusion</u>

Freeman has not proven his prima facie case. He has not even created a fact issue as to the existence of a prima facie case. Freeman has failed to prove that his communications to the Board were statutorily protected reports under the Act,

29

and has failed to prove a causal connection between his termination and his September 30 communication to the Board. Therefore, this part of Ace's motion is granted.

Thus, since Freeman has failed to prove a prima facie case on any of his claims, Ace's motion is granted in its entirety. Moreover, even assuming, arguendo, that Freeman had proven his prima facie case on any of his claims, the following discussion demonstrates that Freeman was terminated for legitimate, nondiscriminatory business reasons. Thus, Ace's motion would still be granted.

### 2. <u>Nondiscriminatory Reason for the Adverse Employment Action</u>

Ace avers that even if Freeman can establish a prima facie case of discrimination, Ace had legitimate, nondiscriminatory reasons for its actions. Ace argues that Freeman was terminated because he was acting in a way that was inappropriate for an Ace manager, and because his actions jeopardized the company. Freeman has acknowledged that as co-CEO he had an obligation to represent Ace to the best of his ability within the community, the company, and the industry. Freeman has admitted that he acted poorly; proved himself untrustworthy; and pursued a relationship with a subordinate employee, knowing that the relationship was inappropriate and could cause problems for Ace. Freeman then lied about the relationship and tried to cover it up. According to Ace, these behaviors weakened Freeman's authority and position in the company,

and therefore these were legitimate nondiscriminatory reasons for terminating Freeman's employment.

### 3.   Pretext

Freeman argues that there are factual issues as to whether he was fired because of his misconduct associated with his relationship with Thomas or in retaliation for blowing the whistle about the mileage reimbursement improprieties or because of discrimination. First, Freeman argues that there was no anti-fraternization policy at Ace, therefore, his relationship with Thomas cannot be a legitimate reason for terminating him. According to Freeman, although Ace may have had a reason to punish Freeman more severely than Thomas because of Freeman's position in the company, that does not justify terminating Freeman without even an exploration of Thomas's role in the relationship. Second, Ace told Freeman that Ace wanted to "overcome this difficulty," and that Freeman had been a "valuable employee." Freeman apparently interprets this as a promise that he would not be disciplined if he broke off his relationship with Thomas, and thus asserts that because of this promise Ace was estopped from firing him.

Freeman also argues that Board members testified that they thought that ending the relationship would allow Freeman to avoid disciplinary measures, and cites Board members' deposition testimony to support this conclusion. According to Freeman, none of the Board members thought that his relationship with

Thomas was anything other than platonic. Thus, summary judgment is not appropriate in this case, especially since the Court is required to look at the facts in the light most favorable to Freeman.

Contrary to Freeman's continued representations in his memorandum, the Board did not promise that no disciplinary action would be taken against Freeman if he discontinued his relationship with Thomas. The closest thing to such a promise is the statement that "[Freeman] should appreciate the fact that this concern was brought forward before it became more serious, at a time when the damage can be repaired." (Def. Ex. K at 2.) The Board also told Freeman that it wanted to "overcome this difficulty," "put this behind us," and that it was willing "to look at whether we can go forward with [Freeman's] continuing leadership." (Id.)  These are not promises. Therefore, Freeman's estoppel argument is without merit.

Freeman was terminated for all the reasons articulated by Ace. The fact is that Freeman was a very high-ranking employee, and Ace rightfully had high expectations for their CEOs. Freeman lied to the Board about his relationship with Thomas, and the Board felt the need to terminate him. The timing of the termination is not suspicious – the Board acted as soon as it read Freeman's October 14 sworn statement. Furthermore, the Board changed its reimbursement

policy and did not seem hostile to any of Freeman's previous reports concerning overpayments and improper reimbursements.

Moreover, the Board members' testimony cited by Freeman does not support the conclusion that since his relationship with Thomas was over, he would not be fired. The Board members' testimony merely indicates that had Freeman broken off the relationship when he said he did and not lied instead, he would have avoided termination. (Pl. Ex. 25 at 45-47; Pl. Ex. 26 at 142; Pl. Ex. 27 at 62; Pl. Ex. 30 at 63-64.) Clearly, this is not what transpired. Freeman continued to pursue the relationship after telling the Board is was over, and lied to the Board and Hansen about the relationship. Ace's proffered reasons for terminating Freeman were not pretextual. Therefore, even if Freeman had proven his prima facie case, his claims would ultimately fail. Freeman was terminated for legitimate nondiscriminatory business reasons.  Claims I, II, and III of the Complaint are thus dismissed.

### C.  Ace's Request for Attorneys' Fees

Ace's request for costs and attorneys' fees associated with this motion is denied.

Based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

(1)    Defendant's Motion for Summary Judgment [Doc. No. 42] is **GRANTED IN PART and DENIED IN PART** as set forth in this memorandum;

(2)    Defendant's Motion is **GRANTED** as to an award of summary judgment on Counts I, II, and III of the Complaint;

(3)    Defendant's Motion is **DENIED** as to an award of costs and attorneys' fees; and

(4)    Counts I, II, and III of the Complaint are **DISMISSED WITH PREJUDICE**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: December 11, 2005

<div style="margin-left:45%">

s / Michael J. Davis
Michael J. Davis
UNITED STATES DISTRICT COURT

</div>